**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NEIGHBORS AGAINST BISON
SLAUGHTER, *et al.*,

          Plaintiffs,

          v.

NATIONAL PARK SERVICE, *et al.*,

          Defendants.

Civil Action No. 19-cv-3144 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Plaintiffs Neighbors Against Bison Slaughter and Bonnie Lynn filed this lawsuit against the National Park Service, the Department of Agriculture ("USDA"), and three government officials claiming they violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, when they allegedly authorized an annual bison hunt in Southern Montana at a location on the edge of Yellowstone National Park called Beattie Gulch. *See* Compl. ¶ 4, ECF No. 1.[1]  According to the plaintiffs, the hunt puts at risk the "hunters, local property owners, residents, and guests" in the vicinity of Beattie Gulch. *Id.* ¶ 1.  Montana's bison hunting season begins November 15, 2019 and the plaintiffs have requested a temporary restraining order and preliminary injunction to enjoin the hunt while their APA and NEPA claims are sorted out. *See generally* Pls.' Mot. for a Temp. Restraining Order and a Prelim. Inj., ECF No. 4.  In response, the defendants request that this case, including plaintiffs' requests for interim injunctive relief, be transferred to the District

---

[1]        The three individuals named as defendants in their official capacities are David Bernhardt, the Secretary of the Interior, Cam Sholly, the Superintendent of Yellowstone National Park, and Sonny Perdue, the Secretary of the USDA. Compl. ¶¶ 20–22.

of Montana, pursuant to 28 U.S.C. § 1404(a) (allowing transfer "[f]or the convenience of parties and witnesses [and] in the interest of justice"). Defs.' Mot. to Transfer ("Defs.' Mot.") at 1, ECF No. 13; Defs.' Reply in Supp. of Defs.' Mot ("Defs.' Reply") at 13, ECF No. 37. In accordance with the expedited schedule proposed by the parties, the briefing on the pending motions was completed on November 8, 2019. For the reasons explained in more detail below, given the long-standing coordinated plan among federal, state, tribal and local government authorities that may be significantly affected by this action, the Court concludes that transfer to the District of Montana best serves the interest of justice and, therefore, grants the defendants' transfer motion.[2] Moreover, because the plaintiffs fail to demonstrate the exigency necessary to justify granting a motion for a temporary restraining order, that motion is denied.

## I.     BACKGROUND

Every winter, when the snows begin to bury the grasses of Yellowstone National Park's mountains, the bison herd heads for lower ground in search of food. Compl. ¶ 2. Many of the Bison leave the park and enter "a quarter-mile-square area at the mouth of Beattie Gulch" in

---

[2]      The plaintiffs argue that their motion for a temporary restraining order and preliminary injunction should take priority over the defendants' motion to transfer, Pls.' Resp. to Fed. Des.' Mot. to Transfer Venue ("Pls.' Opp'n") at 3, ECF No. 32, citing a statutory instruction for courts to "expedite the consideration of . . . any action for temporary or preliminary injunctive relief," 28 U.S.C. § 1657(a). This argument is without merit for several reasons. First, the cited statute prescribes the kinds of motions that should receive expedited consideration, not the order in which motions must be decided. Second, the defendants' request for expedited consideration of their motion to transfer venue was granted, pursuant to the same statute on which plaintiffs rely, which empowers a court to "expedite the consideration of . . . any other action if good cause therefor is shown." 28 U.S.C. § 1657(a); Min. Order (Oct. 28, 2019) (granting the defendants' motion to expedite). Thus, the two motions for a preliminary injunction and transfer are on equal footing, and this Court has chosen to consider the defendants' motion to transfer first. The cases plaintiffs cite are not to the contrary. Pls.' Opp'n at 3–6 (citing *Comm. on Ways and Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*, No. 19-cv-01974, 2019 WL 4094563, at *2 (D.D.C. Aug. 29, 2019) (explaining that Section 1657 "left it to the courts to 'determine the order in which civil actions are heard and determined'"); *Tinnus Enters., LLC v. Telebrands Corp.*, No. 6:17-cv-00170-RWS, 2018 WL 3455543, at *2 (E.D. Tex. Jul. 16, 2018) (refusing to stay enforcement of an injunction on account of a motion for transfer that was filed after the injunction was granted); *Concerned Rosebud Area Citizens v. Babbitt*, 34 F. Supp. 2d 775, 777 (D.D.C. 1999) (resolving a motion to transfer *before* resolving a motion for a preliminary injunction)). Finally, as discussed *infra*, in Part III.B, given the important local interests in having the challenged hunt's fate decided in Montana, acceding to the plaintiffs' urging to resolve their entitlement to injunctive relief before consideration of transfer, would put the proverbial "cart before the horse" and make little sense.

Gardiner, Montana. *Id.* ¶¶ 2, 15. Beattie Gulch sits within the Custer-Gallatin National Forest, an enormous swath of federal land hugging Yellowstone National Park's northwest corner. Pls.' Points and Auths. in Support of Their Mot. for a Temp. Restraining Order and a Prelim. Inj. ("Pls.' Mem.") at 6, ECF No. 4-1. Hunting is forbidden within Yellowstone, 16 U.S.C. § 26 ("All hunting . . . is prohibited within the limits of [the] park."), but in 2005, after a 14-year hiatus, Montana reopened a bison hunt just outside park boundaries in Beattie Gulch. Pls.' Mot., Ex. C ("Letter from Montana Wildlife") at 1, ECF 4-11. Over time, the hunt has grown in both the number of bison killed and the number of hunters participating. Pls.' Mem. at 12. While Montana citizens are authorized to hunt under the laws of that state, at least six tribal governments now also conduct their own hunts, claiming the right under various treaties to do so on open and unclaimed federal lands within Montana. *See* Br. of *Amici Curiae* in Support of Fed. Defs.' Corrected Opp'n to Pls.' Mot. for a Temp. Restraining Order and Prelim. Inj. ("Amicus Br.") at 1, ECF No. 31.[3]

Plaintiff Bonnie Lynn owns land and a few cabins across the street from Beattie Gulch. Compl. ¶ 15. She worries that "[s]ooner or later," the intensifying hunt "is going to kill someone." *Id.* ¶ 3. Lynn created the other plaintiff in this case, Neighbors Against Bison Slaughter, in response to this alleged danger. *Id.* ¶ 17. The plaintiffs, both Montana residents, lay the blame for the risks posed by the hunt at the feet of two federal agencies, the NPS and USDA, and three federal officials, the Secretary of the Interior, the Secretary of Agriculture, and the Superintendent of Yellowstone National Park. *Id.* ¶¶ 18–22.

---

[3]     This is not to suggest that the Tribes have only recently started hunting bison in Beattie Gulch. Native American Tribes, many of whom are *amici* in this case, aver that they have hunted bison "in the Greater Yellowstone Ecosystem since time immemorial." Amicus Br. at 11.

That hunt, now the focus of this suit, is part of a decades-long, multi-agency, and multi-jurisdictional project to manage the bison population. Once on the brink of extinction, beginning in the 1960s the bison herd began to grow rapidly and so did the risk that the bison would transmit diseases to cattle grazing outside Yellowstone. Pls.' Mot., Ex. H ("Fed. ROD") at 3–4, ECF No. 4-16. In the early 1990s, anxious to prevent the infection of livestock, the State of Montana and several federal agencies agreed to work together toward a comprehensive bison management scheme. *Id*. at 4. Federal-state cooperation, however, was not always smooth and, in 1995, Montana sued the National Park Service and the Animal and Plant Health Inspection Service ("APHIS"), an agency within the USDA. *Id*. at 4; *Montana v. Babbitt*, No. 6:95-cv-6 (D. Mont. Jan. 17, 1995). The state and federal agencies settled by committing to a schedule for the completion of a "long-term bison management plan and environmental impact statement." Fed. ROD at 4. Pursuant to the settlement agreement, Montana's lawsuit was stayed until the plan was finished. Order (Nov. 20, 1995), *Montana v. Babbitt*, No. 6:95-cv-6 (D. Mont.). In late 2000, with the aid of mediation before a magistrate judge in the District of Montana, the Interagency Bison Management Plan ("IBMP") and accompanying environmental impact statement were published. Order (Jan. 9, 2001), *Montana v. Babbitt*, No. 6:95-cv-6 (D. Mont.) (dismissing the case); Fed. ROD at 1 (noting that the final "Environmental Impact Statement and Bison Management Plan" were published on December 20, 2000); Fed. ROD at 15 (explaining that Montana had published its own environmental impact statement on November 15, 2000).

Although the IBMP was negotiated between and initially executed by state and federal officials, the management of the plan has since grown to include tribal governments. Eight organizations make up the IBMP's governing body: APHIS, NPS (specifically Yellowstone administrators), the United States Forest Service ("USFS") (specifically administrators in the

Custer-Gallatin National Forest), the Montana Fish, Wildlife & Parks Department, the Montana

Department of Livestock (including the Montana State Veterinarian), the Confederated Salish &

Kootenai Tribes, the InterTribal Buffalo Council, and the Nez Perce Tribe (collectively "IBMP

Members"). Pls.' Mot., Ex. D ("2019 Winter Plan") at 1, ECF No. 4-12. The IBMP structures

the coordination between these organizations in order to meet bison management priorities.

Since its adoption, the IBMP has been updated periodically by the IBMP Members

through a process called "adaptive management." Pls.' Mot., Ex. E ("2011 Adaptive Mgmt.

Adjs.") at 1, ECF 4-13. These periodic adjustments are intended to allow the plan to adapt to the

ever-changing on-the-ground reality of the herd's movement and size, but "are intended to be

applied within the framework of the IBMP and not alter its basic management direction or

goals." *Id*. Adjustments include changing the areas in which bison are allowed to roam and

altering the techniques used to keep the bison population within prescribed numbers. *Id*. at 1–2.

One such technique is the capture of bison within Yellowstone and their distribution to

slaughterhouses throughout the country. 2019 Winter Plan at 11. The hunt is another tool. *Id.* at

6 ("The IBMP members, through the adaptive management process, have agreed that the harvest

of bison will be a preferred method for managing their abundance and distribution to the extent

possible."). Montana and the various tribal governments each manage their own hunts, "); Defs.'

Opp'n to Pls.' Mot. ("Defs.' Opp'n"), Ex. 2 ("Tribal Mem. of Agreement") at 1, ECF No. 25-2

(tribal agreement creating rules to ensure "regular, predictable, safe, and respectful bison hunt in

Beattie Gulch"); Defs.' Opp'n, Ex. 4 ("MT Hunting Regs.") at 1-4, ECF No. 25-4 (describing

Montana's bison hunting regulations). All IBMP Members, however, work in concert to ensure

that the number of bison killed in the hunt aligns with population goals. 2019 Winter Plan at 7-8

("The IBMP partners will work together to coordinate trapping and hunting activities to achieve

reasonable . . . [d]istribution of bison . . . throughout the northern and western management areas in Montana.").  Indeed, NPS has agreed to limit its capture of bison so as to "support tribal and state hunting." *Id*. at 10.

To ensure adequate coordination between IBMP members, operating procedures are published each year that "outline[] the actions necessary to implement the [IBMP]." *Id.* at 2.  In late December of 2018, the 2019 Winter Plan was approved by representatives from the eight IBMP members.  *Id*. at 1.  Plaintiffs focus their claims on the 2019 Winter Plan.  Compl. ¶¶ 59, 63, 68, 72(a)-(c).  Over eight months after publication of the 2019 Winter Plan, the plaintiffs, in August 16, 2019, informed Yellowstone's Superintendent and the Custer-Gallatin National Forest's Supervisor of their belief that the USFS, NPS, and USDA "have violated federal law by failing to impose reasonable restrictions on the migration and hunting of wild bison in Beattie Gulch."  Pls.' Resp. to Fed. Defs.' Mot. to Transfer ("Pls.' Opp'n"), Ex. A ("Demand Letter") at 1, ECF No. 32-1.  Neither agency acceded to the plaintiffs' demand to "immediately suspend the upcoming hunting season (2019-20) in Beattie Gulch." *Id.* at 3.  Consequently, almost three months later, the plaintiffs filed suit in this Court on October 21, 2019, Compl. at 1, followed two days later, by their filing of a motion for a temporary restraining order and a preliminary injunction "to stop this winter's hunt." Pls.' Mot. at 3.

After being ordered to confer and propose a briefing schedule, Min. Order (Oct. 23, 2019), the parties agreed that the defendants would have until October 31 to respond to the plaintiff's motion for preliminary relief and that the plaintiffs would have until November 8 to file any reply.  Proposed Scheduling Order at 1, ECF No. 12-1; Min. Order (Oct. 25, 2019) (setting briefing schedule).  On October 25, 2019, the same day the parties proposed a briefing schedule, the defendants moved to transfer this case to the District of Montana and to expedite

consideration of that motion. Defs.' Mot. at 1; Defs.' Mot. to Expedite Consideration of Defs.' Mot. to Transfer Venue at 2, ECF No. 14. The motion to expedite was granted and the plaintiffs were ordered to respond to the transfer motion by November 4 and the defendants were given until November 8 to reply, should they wish. Min. Order (Oct. 28, 2019). Since entry of the scheduling order, the Confederated Salish and Kootenai Tribes of the Flathead Reservation, the Nez Perce Tribe, the Confederated Tribes of the Umatilla Indian Reservation, and the Confederated Tribes and Bands of the Yakama Nation, all tribes that participate in the bison hunt, have been granted leave, without any objection from the parties, to file an *amicus curiae* brief in support of the defendants. Min. Order (Nov. 1, 2019). Late on November 8, the last of the authorized briefing was submitted. Defs.' Reply at 13 (filed at 8:01 p.m.); Pls.' Reply Br. in Supp. of their Mot. for a Temp. Restraining Order and a Prelim. Inj. ("Pls.' Reply") at 25, ECF No. 38 (filed at 10:17 p.m.). This matter is now ripe for consideration.

## II.     LEGAL STANDARD

A case may be transferred to any district where venue is also proper "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a); *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 59 (2013) ("§ 1404(a) does not condition transfer on the initial forum's being 'wrong' . . . it permits transfer to any district where venue is also proper (*i.e.*, 'where [the case] might have been brought') or to any other district to which the parties have agreed by contract or stipulation."). The Supreme Court has explained that "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). The discretion conferred by this statute "is broad" but "not

untrammeled." *Fine v. McGuire*, 433 F.2d 499, 501 (D.C. Cir. 1970); *In re Scott*, 709 F.2d 717, 720 (D.C. Cir. 1983) ("[T]here are limits to the broad discretion accorded courts under section 1404(a)."). "[T]ransfer in derogation of properly laid venue" in the District of Columbia "must . . . be justified by particular circumstances that render the transferor forum inappropriate by reference to the considerations specified in that statute." *Starnes v. McGuire*, 512 F.2d 918, 925 (D.C. Cir. 1974). "Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient." *Van Dusen*, 376 U.S. at 645–46. The movant bears the burden of persuasion that transfer of an action is proper. *See SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1154 (D.C. Cir. 1978) (*citing Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966)).[4]

## III. DISCUSSION

The first step in resolving a motion for transfer of venue under § 1404(a) is to determine whether the proposed transferee district is one where the action "might have been brought." 28 U.S.C. § 1404(a); *Atl. Marine*, 571 U.S. at 59; *Jones v. Gasch*, 404 F.2d 1231, 1237 n.25 (D.C. Cir. 1967) ("[C]ivil cases may be transferred only to a district or division wherein jurisdiction and proper venue obtain."). In actions raising a federal question by naming as a defendant a federal agency or United States official in his or her official capacity, venue is proper in any judicial district where (1) "a defendant in the action resides;" (2) "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;" or (3) a "plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). Both plaintiffs are residents of Montana, *see* Compl. at 1, and challenge

---

[4]     Although the plaintiffs assert that the defendants must make their case for transfer by "clear and convincing evidence," Pls.' Opp'n at 9 (*citing N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am.*, 599 F.3d 102, 113–14 (2d Cir. 2010)), that standard has never been articulated as the law in this Circuit. That burden is evidently applied in the Second Circuit, but rarely outside it. *See* 15 WRIGHT & MILLER, FED. PRAC. & PROC. § 3848 n.24 (4th ed. 2019).

federal agency actions involving the bison hunt in Beattie Gulch located in the District of Montana, *id.* ¶ 2.  Wisely, the plaintiffs thus do not contest that they "could also have filed this case" in Montana.  Pls.' Opp'n at 9.  Having cleared that first hurdle, consideration of which forum best serves the convenience of the parties and witnesses (should there be any) and the interest of justice is the focus of the remainder of this discussion.  28 U.S.C. § 1404(a).

In resolving motions to transfer venue under Section 1404(a), courts have analyzed several private and public-interest factors, which elucidate the concerns implicated by the two express statutory factors of the "convenience of parties and witnesses" and "the interest of justice." 28 U.S.C. § 1404(a); *see, e.g.*, *Stewart Org.*, 487 U.S. at 29 (noting that motion to transfer under this statute "calls on the district court to weigh in the balance a number of case-specific factors"); *accord Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947) (outlining public and private interests to be considered in the analogous *forum non conveniens* inquiry). The private-interest factors are addressed first, followed by the public-interest factors.

## A.      Analysis of Private-Interest Factors

At the outset, the parties dispute which private-interest factors are relevant to this inquiry and the weight to be given those factors.  The defendants recite six factors which have been applied for over two decades in this Court.  Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem.") at 9, ECF No. 13-1 (citing *Trout Unlimited v. United States Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996)).  Those factors are: "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; [and] (6) the ease of access to sources of proof."  *Md. Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp. 3d 80, 95 (D.D.C. 2019).  Use of these factors has crystalized in this District, without being expressly condoned by the Supreme Court

or the D.C. Circuit.  The now-rote six-factor test seems to have originated instead from treatises and out-of-circuit case law.  *See Trout Unlimited*, 944 F. Supp. at 16 & nn.4–9 (*citing Jumara v. State Farm Ins. Co.*, 55 F. 3d 873, 879 (3d Cir. 1995) (enumerating private and public interests highlighted in 1A PT.2 JAMES W. MOORE & BRETT A. RINGLE, FED. PRAC. ¶ 345, at 4446 (2d ed. 1995) and 15 WRIGHT & MILLER, FED. PRAC. & PROC. § 3848, at 385 (2d ed. 1986)); *and* WRIGHT & MILLER, §§ 3848, 3851 at 385, 420–22 (2d ed. 1986)).

The plaintiffs, on the other hand, point to *Atlantic Marine*, the Supreme Court's most recent discussion of the transfer statute.  There, the Supreme Court remarked, drawing wholesale from that Court's *forum non conveniens* precedents, that "[f]actors relating to the parties' private interests include 'relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.'"  *Atl. Marine*, 571 U.S. at 62 n.6 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)); *see also Gulf Oil Corp.*, at 508–09 (outlining same factors to be considered in *forum non conveniens* inquiry).  In so doing, the Supreme Court confirmed that the same factors relevant in the *forum non conveniens* context to overcome the ordinarily strong presumption in favor of the plaintiff's choice of forum apply to the decision whether a case should be transferred.  *See Atl. Marine*, 571 U.S. at 61 ("[B]oth § 1404(a) and the *forum non conveniens* doctrine from which it derives entail the same balancing-of-interests standard."); *Norwood v. Kirkpatrick*, 349 U.S. 29, 30–32 (1955) (observing that "the relevant factors have" not changed under transfer statute); *Scott*, 709 F.2d at 720 (instructing that, under transfer statute, "[i]n reaching its decision, a court must give due regard to the factors traditionally associated with the doctrine of *forum non conveniens*"); *Fine*,

433 F.2d at 501 (concluding that transfer statute "still requires the court to give consideration to the traditional factors" under *forum non conveniens*).

At the same time, given the difference in the severity of the outcome between outright dismissal under *forum non conveniens* and mere transfer to an alternative forum, the Supreme Court has acknowledged that "[d]istrict courts were given more discretion to transfer under § 1404(a) than they had to dismiss on grounds of *forum non conveniens." Piper Aircraft*, 454 U.S. at 253*; see also Norwood*, 349 U.S. at 32 (explaining that Section 1404(a) "permit[s] courts to grant transfers upon a lesser showing of inconvenience" than would justify dismissal under *forum non conveniens,* but "[t]his is not to say that the relevant factors have changed or that the plaintiff's choice of forum is not to be considered, but only that the discretion to be exercised is broader"); *Jones*, 404 F.2d at 1237 n.25 (noting that "a lesser showing of inconvenience warrants a transfer than can justify a dismissal" under the related doctrine of *forum non conveniens*). Thus, though the defendants need not show the same level of inconvenience as for dismissal under *forum non conveniens*, the factors underlying that doctrine provide the test for transfer under Section 1404(a).

To be sure, the *Atlantic Marine* private-interest factors derived from the doctrine of *forum non conveniens* significantly overlap with four of the six factors regularly used in this District. Nevertheless, this conclusion that *Atlantic Marine*'s private-interest factors should be used in assessing transfer of venue has important ramifications for the parties' dispute over the weight that must be afforded the plaintiffs' choice of forum. While this Court's generally-used private-interest set of factors clumps the plaintiff's and defendant's differing forum choices among the six factors to be considered, this may lead to an incorrect assessment of the deference due to the plaintiff's choice. Instead, the test under the transfer statute is more appropriately framed to

focus on whether the presumption in favor of the plaintiff's choice of forum is overcome by consideration of all relevant public and private-interest factors pointing to the alternative forum as more convenient and in service of the interest of justice for resolution of the merits. *See Van Dusen*, 376 U.S. at 634 ("Congress, in passing [§] 1404(a), was primarily concerned with the problems arising where, despite the propriety of the plaintiff's venue selection, the chosen forum was an inconvenient one.").

Defendants posit bluntly that, due to their residency in Montana, "plaintiffs' choice of forum is not entitled to deference." Defs.' Mem. at 9 (capitalization altered). This is incorrect. As the Supreme Court made clear in *Atlantic Marine,* courts must "give some weight to the plaintiffs' choice of forum." *Atl. Marine*, 571 U.S. at 62 n.6 (citing *Norwood*, 349 U.S. at 32); *see also Savoy Indus.*, 587 F.2d at 1154–55 ("There can be no doubt that a plaintiff's choice of forum is entitled to at least some weight." (citing *Menard v. Mitchell*, 430 F.2d 486, 488 n.3 (D.C. Cir. 1970) and *Gulf Oil Corp.*, 330 U.S. at 508); *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 576 (D.C. Cir. 2010) (noting, in *forum non conveniens* context, "[t]here is a substantial presumption in favor of a plaintiff's chosen forum." (internal quotation marks omitted)).

The defendants rely on cases ascribing less weight to a plaintiff's choice of forum when this "forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter." *W. Watersheds Proj. v. Pool*, 942 F. Supp. 2d 93, 97 (D.D.C. 2013) (quoting *Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 67 (D.D.C. 2003)); *see* Defs.' Mem. at 9 (citing *W. Watersheds Proj.*, 942 F. Supp. 2d at 98). According to defendants, that is particularly true when transfer is sought "to the plaintiffs' resident forum." Defs.' Mem. at 10 (quoting *Pres. Soc'y of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d 49, 54 (D.D.C. 2012) (quoting *Airport*

*Working Grp. Of Orange Cty., Inc. v. Dep't of Def.*, 226 F. Supp. 2d 227, 230 (D.D.C. 2002))).

This proposition is on sounder ground. As the Supreme Court has explained, "a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum" since "[w]hen the home forum has been chosen, it is reasonable to assume that this choice is convenient." *Piper Aircraft*, 454 U.S. at 255–56. By contrast, "[w]hen the plaintiff is foreign . . . this assumption is much less reasonable" and "a foreign plaintiff's choice deserves less deference." *Id.* at 256; *see also Pain v. United Techs. Corp.*, 637 F.2d 775, 786 (D.C. Cir. 1980) (finding, in *forum non conveniens* context, that presumption in favor of plaintiffs' choice of forum in wrongful death action arising from helicopter crash off the coast of Norway does not "come[] into play with maximum force" when only one of nineteen plaintiffs was American citizen and none were a resident of chosen forum). Accordingly, the plaintiffs' choice to bring suit in the non-resident forum of Washington, D.C. is afforded "some weight" and consideration of the remaining factors identified by the Supreme Court will be against that backdrop. *Atl. Marine*, 571 U.S. at 62 n.6.

The first three *Atlantic Marine* private-interest factors—access to sources of proof, witnesses, and view of the property at issue—play little role here since the claims asserted arise under the APA and NEPA and, consequently, this case will be decided on an administrative record. *See Pres. Soc'y of Charleston*, 893 F. Supp. 2d at 56 ("[T]he convenience of witnesses and the ease of access to sources of proof, are neutral with respect to transfer" when the case will be decided on the basis of an administrative record.); *see also Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 12 (D.D.C. 2007). More precisely, the plaintiffs' claims hinge on whether the defendants are required to undertake a new environmental impact study and whether they are arbitrarily and capriciously implementing the statutes they are empowered to execute. Compl.

¶¶ 54–71.  Resolution of these claims will not turn on the testimony of witnesses and thus the first three factors are neutral and do not outweigh in any way the presumption favoring the plaintiffs' forum choice.

Considering the final factor, "all other practical problems that make trial of a case easy, expeditious and inexpensive," *Atl. Marine*, 571 U.S. at 62 n.6, plaintiffs point out that their *pro bono* counsel has its offices in Washington, D.C.  Pls.' Opp'n at 16.  Yet, "the location of counsel carries little, if any, weight in an analysis under § 1404(a)."  *State v. U.S. Army Corps of Eng'rs*, 304 F. Supp. 3d 56, 66 (D.D.C. 2018) (quoting *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 52 n.7 (D.D.C. 2000)); *Tower Labs., Ltd. v. Lush Cosmetics Ltd.*, 285 F. Supp. 3d 321, 326 (D.D.C. 2018) (same).  On the other hand, plaintiffs reside in Montana, and while driving to the local federal courthouse may take several hours, Pls.' Opp'n at 15, the drive likely pales in comparison to the expense and time consumed by traveling from Montana to the District of Columbia.  Moreover, several non-parties have expressed interest in this case.  Amicus Br. at i.  The *amici* tribes, from Montana, Idaho, Washington, and Oregon, *id*., would also likely find travel to a neighboring or nearby state easier than across the country should their attendance at any hearings in this matter be necessary or desired.  The defendants have suggested that the State of Montana may also "seek to participate in this litigation in some fashion."  Defs.' Mem. at 12 n.2.  It has not sought to do so yet, but Montana's intimate involvement with the IBMP means this claim is not farfetched.  This factor thus slightly favors transfer.

In sum, the first three *Atlantic Marine* factors are irrelevant to this case while the fourth factor tilts somewhat toward transfer.  The slight private benefit to the potential convenience of a potential intervenor, however, is not enough to overcome the weight that must be accorded the

plaintiffs' choice of forum. The private-interest factors thus weigh against transfer to the District of Montana.

**B.    Analysis of Public-Interest Factors**

Even though the private-interest factors weigh in favor of keeping this case in plaintiffs' chosen forum, consideration of the compelling public-interest factors warrants transfer. Courts look to three factors in evaluating the public interest: (1) "the interest in having the trial of a diversity case in a forum that is at home with the law"; (2) "the administrative difficulties flowing from court congestion"; and (3) "the local interest in having localized controversies decided at home." *Atl. Marine*, 571 U.S. at 62 n.6. These factors align with the public-interest factors generally used in this Court. *See W. Watersheds Proj.*, 306 F. Supp. 3d at 356 (describing the public-interest factors as "(1) the local interest in making local decisions regarding local controversies; (2) the relative congestion of the transferee and transferor courts; and (3) the potential transferee court's familiarity with the governing law" (quoting *United States v. H & R Block, Inc.*, 789 F. Supp. 2d 74, 78 (D.D.C. 2011))).

The first factor "is generally applied in cases that implicate state law, with which federal courts are not equally familiar." *Oceana v. Bureau of Ocean Energy Mgmt.*, 962 F. Supp. 2d 70, 78 (D.D.C. 2013). Given that this case has not come to federal court based on the parties' diversity, the typical formulation of this factor is not helpful. Brought under the APA and NEPA, resolution of plaintiffs' claims will involve the interpretation of those and other federal laws with which this Court and the District of Montana are presumed to be equally familiar. Nevertheless, the import of this factor is to consider the comparative familiarity with the pending issues of the alternative jurisdictions. Here, the District of Montana likely has more familiarity with the issues surrounding bison management on federal lands within Montana. Indeed, the

IBMP was the product of a lawsuit between Montana and various federal agencies in that court. *See* Part I, *supra*. Defendants have also pointed out that the District of Montana recently considered another case addressing bison hunting that raised similar claims of violations of NEPA on the part of NPS and USDA. Defs.' Mem. at 13 (citing Compl., *Cottonwood Envtl. Law Ctr. v. Zinke*, 18-cv-12 (D. Mont. Feb. 20, 2019)). If anything, given the District of Montana's familiarity with the legal arrangements between tribal, state, and federal governments surrounding bison management, the first public-interest factor weighs in favor of transfer. *Foote v. Chu*, 858 F. Supp. 2d 116, 123 (D.D.C. 2012) (describing the first factor as also concerning "the pendency of related actions in [the transferee] forum").

The defendants correctly concede that the second factor regarding comparative congestion of the courts, is "largely neutral." Defs.' Mem. at 14; *see Parsons v. Chesapeake & Ohio Ry. Co.*, 375 U.S. 71, 73 (1963) ("[A] trial judge weighing the interests of justice could legitimately consider the condition of his court's docket an important factor."). The district courts in Montana and the District of Columbia have similar numbers of pending civil cases per active judge. Montana had 664 pending cases when last reported and three active judges, for a rough average of just over 221 cases per judge. Judicial Business 2018, Administrative Office of the U.S. Courts, Table C, U.S. Dist. Courts—Civ. Cases Commenced, Terminated, and Pending During the 12-Month Periods Ending September 30, 2017 and 2018, at 4.[5] This Court had 3,525 pending cases and 15 active judges for a rough average of 235 cases per judge. *Id*. at 1. In addition, the median time between the filing and disposition of a case in this Court is 5.8 months while it is 10.1 months in Montana. Judicial Business 2018, Administrative Office of the U.S. Courts, Table C-5, U.S. Dist. Courts—Median Time Intervals from Filing to Disposition of Civ.

---

[5] Available at https://www.uscourts.gov/sites/default/files/data_tables/jb_c_0930.2018.pdf.

Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending

September 30, 2018, at 1, 5[6]; *see also Foote*, 858 F. Supp. 2d at 123 (relying on median time

from filing to disposition in analyzing the second factor). These differences are so minimal as to

render this factor neutral.

Finally, the third factor regarding the local interest in having localized controversies

decided at home so strongly favors transfer to Montana as to render the other factors relatively

insignificant. As described *supra*, in Part I, the IBMP is the product of decades of negotiation

between Montana, federal agencies, and Native American Tribes that wish to exercise their

treaty hunting rights in Montana. The adaptive management procedures adopted under the IBMP

call for on-the-ground analysis of the ever-changing bison population and migration patterns and

require constant coordination between the eight IBMP Members. The decision whether to grant

the plaintiffs a preliminary injunction, moreover, will affect Montana citizens most directly,

either by relieving them of the dangers to property and person the hunt allegedly poses by

preventing the hunt this winter or by allowing the hunt to go forward as planned. *W. Watersheds

Proj.*, 942 F. Supp. 2d at 103 (transferring when "[t]he implications of a decision resolving [the]

dispute will be felt most acutely" in the transferee district). These considerations militate

strongly in favor of transferring this case to Montana.

The plaintiffs contend that because the bison migrate from Yellowstone, which is within

the judicial district of Wyoming, 28 U.S.C. § 131, this case is not local to Montana. Pls.' Opp'n

at 18–19. Plaintiffs, however, have centered their allegations not around bison migration within

Yellowstone, but around the hunt at Beattie Gulch. Compl. ¶ 72. Specifically, they take aim at

the 2019 Winter Plan, which bears the signatures of representatives from the IBMP Members

---

[6]     Available at https://www.uscourts.gov/sites/default/files/data_tables/jb_c5_0930.2018.pdf.

each of whom lives in or near Montana.  2019 Winter Plan at 1.  Moreover, the injuries plaintiffs allege are all local: "The . . . hunt has stopped Ms. Lynn from renting her vacation rental cabins during the winter, lowered her property values, prevented her from using her properties for family visits, and caused her emotional trauma."  Compl. ¶ 16.  Speaking for Neighbors Against Bison Slaughter, Lynn worried that the hunt "threaten[s] the safety and peace of the neighborhood[,] . . . creates a public safety hazard, risks the lives of the neighbors and their property, and upsets [their] way of life."  Compl. ¶ 17.  The hunt, in a small corner of Montana, is thus an intensely local affair, even if it is the product of a multi-jurisdictional management plan.

The plaintiffs also argue, relying heavily on another case in this Court involving Yellowstone, that the park's national significance favors venue in Washington, D.C.  Pls.' Opp'n at 20–21.  In *Greater Yellowstone Coal. v. Kempthorne*, concerning the use of snowmobiles in Yellowstone, this Court retained jurisdiction in part because "conserving the scenery, natural objects and wildlife of that park is a matter of great national importance."  No. 07-cv-2111, 2008 WL 1862298 at *6 (D.D.C. Apr. 24, 2008) (unpublished).  Unlike in that case, however, the plaintiffs here do not sue in an attempt to "protect[] and enhance[] . . . the National Park System," undoubtedly an issue of national significance.  *Id.* at *2.  The complaint in this case is preoccupied with the danger the hunt poses for "hunters, local property owners, residents, and guests" only at Beattie Gulch.  Compl. ¶ 1.

Moreover, the same judge that decided the case on which plaintiffs rely later explained that transfer was not appropriate in *Greater Yellowstone Coal.* because it did not present a situation in which "the only nexus to the District of Columbia [was] the fact that federal agencies involved in the decision-making are located here."  *Niagara Preservation, Coal., Inc. v. FERC*,

956 F. Supp. 2d 99, 108 (D.D.C. 2013) (transferring when "many of the decisions regarding the [challenged] Project were made in New York by . . . various state agencies").  The argument for retaining venue in this case is perhaps even less compelling—the only involvement of officials in Washington, D.C. in the design of the 2019 Winter Plan and in bison management operations more generally, is speculative at best.  Plaintiffs suggest that former Secretary of the Interior Ryan Zinke, who resigned two weeks before the 2019 Winter Plan was published, was personally involved in the decisionmaking process by pointing to two articles in which the former Yellowstone Superintendent mused that he may have been fired over his and the Secretary's differing views surrounding bison management.  Pls.' Opp'n at 22 (citing Edward O'Brien, *Yellowstone Park Chief Blames Bison Politics for His Departure*, Yellowstone Public Radio (Aug. 9, 2018)[7] and Matthew Brown, *Yellowstone Boss Says Trump Administration Forcing Him Out*, Associated Press (June 7, 2018)[8]).

Even were that speculation accurate, those articles do not aid the plaintiffs because they only describe a disagreement between the former secretary and the former superintendent about the number of bison the park could sustain, not about whether hunting should be a part of the IBMP or the details of the 2019 Winter Plan.  Those details were worked out between Montana state officials, tribal governments, and federal officials in or near Montana.  2019 Winter Plan at 1.  Moreover, the fact that a particular policy may have been overseen by an official in Washington, D.C. "is a factor to be considered," but is not dispositive.  *Starnes*, 512 F.2d at 929 (noting that the possibility that litigation surrounding "a national policy issue . . . may involve testimony by the policymakers" is particularly relevant); *see also Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 25–26 (D.D.C. 2002) ("[M]ere involvement on the part of federal

---

[7]    Available at https://www.mtpr.org/post/yellowstone-park-chief-blames-bison-politics-his-departure.
[8]    Available at https://www.apnews.com/24808bac6ff445998da7254d5b299ced.

agencies, or some federal officials who are located in Washington D.C. is not determinative."); *Pac. Mar. Ass'n v. N.L.R.B.*, 905 F. Supp. 2d 55, 62 (D.D.C. 2012) (transferring case to Oregon when, "although the decision at issue in [the] action was made in Washington, D.C., 'any role played by officials in the District of Columbia is overshadowed by the fact that their decisions were based on work done by government employees' in Oregon," (quoting *Airport Working Grp. of Orange Cty., Inc.*, 226 F. Supp. 2d at 230)).

The tribes participating as *amici curiae* are deeply invested in their ability to continue to hunt bison in Beattie Gulch for cultural and subsistence purposes. Amicus Br. at 3. The State of Montana has an interest in regulating bison hunting within its boundaries. The citizens concerned about the hunt's intensity are citizens of Montana. Many of the citizens who will be denied the chance to hunt if plaintiffs succeed are from Montana as well. The plaintiffs' choice to have this important local dispute be resolved hundreds of miles from its center risks undermining the important interests animating the Supreme Court's view that local controversies are best resolved locally. *Gulf Oil Corp.*, 330 U.S. at 509 ("In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only."). Thus, transferring this case to the District of Montana best serves "the interest of justice." 28 U.S.C. § 1404(a).[9]

---

[9]       The plaintiffs also requested a temporary restraining order ("TRO") and a preliminary injunction under Federal Rule of Civil Procedure 65. FED. R. CIV. P. 65(a) (addressing preliminary injunctions) and (b) (addressing TROs). By its terms, issuance of a TRO requires "specific facts . . . clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and" consequently, "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b)(1)(A)–(B). Here, the plaintiffs' actions belie the need for "immediate" action contemplated for issuance of a TRO, by waiting for almost eight months to seek relief after the 2019 Winter Plan had been adopted and several months after their concerns were relayed to federal government authorities. Moreover, the plaintiffs' filings have not made the requisite "clear[] show[ing]" of *immediate* irreparable harm. In their TRO motion, the plaintiffs note that the 2019 Winter Plan "starts the hunting season [on] November 15, 2019" but concede that "hunting will not ultimately start until deep snow forces the bison" into Beattie Gulch. Pls.' Mot. at 2. Indeed, in other filings they admit that "no bison are currently leaving Yellowstone" and "any closure of Beattie Gulch would currently impact no one." Pls.' Opp'n at 3. More to this point, they reveal that "[l]ast winter . . . bison did not exit Yellowstone north to Beattie Gulch until months into 2019." *Id.* Aside

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that transfer to the District of Montana is in the

interest of justice and warranted under 28 U.S.C. § 1404(a).  Accordingly, the defendants'

motion to transfer venue is GRANTED.  In addition, the plaintiffs' motion for a temporary

restraining order is DENIED.

An appropriate Order accompanies this Memorandum Opinion.

Date: November 14, 2019

_____
BERYL A. HOWELL
Chief Judge

---

from vague assertions that "[t]he weather could turn any moment," Pls.' Mot. at 3; Pls.' Opp'n at 3 ("The weather could turn any time."), there is no evidence that any preliminary injunctive relief cannot wait until the District of Montana has had the opportunity to consider the merits of the plaintiffs' motion for a preliminary injunction.  The TRO motion is thus DENIED.

The plaintiffs' motion for a preliminary injunction, made in the same document as their TRO motion, Pls.' Mot. at 1, and their related Motion to Strike, ECF No. 33, however, are TRANSFERRED to the District of Montana along with the remainder of this case.