IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



FILED
DEC 0 2 2019
Clerk, U S District Court
District Of Montana
Billings

NEIGHBORS AGAINST BISON SLAUGHTER and BONNIE LYNN,

Plaintiffs,

vs.

THE NATIONAL PARK SERVICE; THE UNITED STATES DEPARTMENT OF AGRICULTURE, FOREST SERVICE; DAVID BERNHARDT, Secretary of the Interior, in his official capacity; CAM SHOLLY, Superintendent of Yellowstone National Park, in his official capacity; and SONNY PERDUE, Secretary of the Department of Agriculture, in his official capacity

Defendants.

CV 19-128-BLG-SPW

ORDER

Before the Court is the Plaintiffs' motion for a preliminary injunction. (Doc. 4). For the following reasons, the motion is denied.

I.  **Background**

This case is about the tension between local residents and several Indian Tribes and hunters over a small patch of public land near Gardiner, Montana, where bison roam from Yellowstone National Park in search of food during winter. In 2005, a convergence of federal, state, and tribal interests opened bison hunting

1

on the public land to Indian Tribes and Montana hunters. Every winter since, Indian Tribes and Montana hunters have harvested roaming bison on the public land. The local residents (the Plaintiffs) own homes and other property next to the public land and object to the bison hunt for several reasons.

The public land in question is a quarter-mile-square area at the mouth of what is known as Beattie Gulch. (Doc. 4-11 at 2). In recent years, the number of Tribes claiming treaty rights to hunt bison in the area has risen to six. (Doc. 4-12 at 6). This has led to the harvest of as many as 200-300 bison during the hunting season from the small plot of public land. (Doc. 4-11 at 2).

The Tribes describe the bison hunt as an important cultural and spiritual use of land which subsists their people. For significantly longer than records were kept, the Tribes have hunted bison in what is now Montana, sometimes traveling hundreds of miles to do so. (Doc. 31 at 1-10). The Nez Perce, for instance, were known to travel as far west as the Pacific Ocean for fish and as far east as Montana for bison. (Doc. 31 at 4). Likewise, the Yakima Nation's ancestors fished the Columbia River and hunted bison in Montana and Wyoming. (Doc. 31 at 8; *see also Yakama Indian Nation v. Flores*, 955 F. Supp. 1229, 1238-1240, 1263 (E. D. Wash. 1997)). All of the Tribes recount the deeply fundamental connection their people and history have to bison, an inherent bond between human, land, and animal forged since time immemorial. (Doc. 31 at 1-10). The Tribes took it upon

themselves to preserve wild herds of bison after the species was nearly destroyed for political reasons. (Doc. 31 at 9, 11-12). Because of this sacred bond, the Tribes specifically negotiated with the United States during Western Expansion to preserve their sovereign hunting rights to bison:

> "The exclusive right of taking fish in all the streams . . . is further secured to said confederated tribes and bands of Indians . . . together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon unclaimed land." Yakima Treaty 1855, 12 Stats., 951.
>
> "The exclusive right of taking fish . . . the privilege of hunting, gathering roots and berries and pasturing their stock on unclaimed lands in common with citizens, is also secured to them." Walla Walla Treaty 1855, 12 Stats., 945.
>
> "The exclusive right of taking fish . . . is further secured to said Indians . . . together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land." Hellgate Treaty 1855, 12 Stats., 975.

Today, the bison hunt is a practice of culture preservation for the Tribes. It serves as a ceremonial activity and social gathering, a method to connect with ancestors who walked the very same plains for millennia. (Doc. 31 at 4). Equally significant, the bison hunt serves the same vital purpose it did then. Bison meat is an integral part of the Tribes' diet; bison hides are used to make clothing and other traditional items. (Doc. 31 at 12).

The Tribes manage the bison hunt through coordination with each other and the federal and state agencies involved. (Doc. 31 at 14). Each summer, the Tribes

3

and agencies discuss bison hunt objectives, dates, safety concerns, no shooting zones, access, and law enforcement. (Doc. 4-12 at 6). Participants in the bison hunt must attend the annual hunt orientation. (Doc. 31 at 1-10). For Beattie Gulch in particular, the Tribes and agencies engage in daily briefings and weekly phone calls to coordinate activities and report harvest data. (Doc. 4-12 at 6-7). To make the hunt safer for property owners in the area, the Tribes and agencies established a 200 yard "clean zone" near Old Yellowstone County Road where hunters are not allowed to shoot. (Doc. 36 at ¶ 3; Doc. 4-1 at v).

The Plaintiffs describe the bison hunt as a chaotic killing field. On some days, 20-30 Indian hunters line up along the land, waiting for the bison to cross the boundary. (Doc. 4-11 at 2). When the bison cross, the hunters gun down the bison simultaneously. (Doc. 4-11 at 2). After the bison are field dressed, unsightly gut piles are left strewn around the field, attracting bears, wolves, and birds. (Doc. 4-27 at ¶¶ 30-33).

The so-called killing field has complicated the lives of the Plaintiffs in several ways. The Plaintiffs are afraid a stray bullet is going to hit them or their homes. They have trouble renting cabins to tourists during the hunting season because the killing field is unpleasant. The gut piles risk the spread of Brucellosis, a disease that can cause undulant fever in humans. Lastly, the sight of bison being

shot is traumatic and robs them of the opportunity to photograph or otherwise enjoy the bison. (Doc. 4-1 at 36-42).

For the past couple of years, the Plaintiffs have voiced their concerns about the bison hunt to the Tribes and federal and state agencies. Due to what the Plaintiffs say has been an insufficient response, they filed this lawsuit on October 21, 2019, in federal district court in Washington D.C. to enjoin the bison hunt for the 2019 hunting season. (Doc. 1). On October 23, the Plaintiffs filed a motion for a temporary restraining order and a preliminary injunction. (Doc. 4). Some of the Tribes' bison hunting season was already underway. (Doc. 4-12 at 7). The state season was set to begin November 15. (Doc. 4-12 at 7). On November 14, the D.C. federal court denied the Plaintiffs' motion for a temporary restraining order and transferred the case to the District of Montana. (Docs. 46, 47, and 49).

Rather than against the Tribes, the lawsuit is against the Department of the Interior, the National Park Service, the Forest Service, Yellowstone National Park, and the Department of Agriculture. The lawsuit alleges the federal agencies violated the Yellowstone Management Act, the Forest Service Organic Act, the National Environmental Policy Act, and the Administrative Procedure Act, when they approved the 2019 bison hunt. (Doc. 1 at 2-3). The 2019 bison hunt was approved in December 2018. (Doc. 4-12 at 1).

**II.  Preliminary injunction standard**

The purpose of a preliminary injunction is to preserve the status quo and prevent the "irreparable loss of rights" before a final judgment on the merits. *Textile Unlimited, Inc. v. A. BMH and Co.*, 240 F.3d 781, 786 (9th Cir. 2001). A preliminary injunction is an extraordinary remedy and should not be awarded as a matter of right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A party seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

The Ninth Circuit permits a sliding scale approach to the *Winter* test. Under the sliding scale, a preliminary injunction is appropriate when a plaintiff raises serious questions going to the merits and the balance of hardships tips sharply in the plaintiff's favor, so long as the other two *Winter* elements are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Here, the Court declines to examine whether the Plaintiffs are likely to succeed on the merits or if they raise serious questions going to the merits because it finds none of the remaining three *Winter* factors weigh in their favor.

### III. Evidentiary hearing

Normally, a district court holds an evidentiary hearing before issuing or denying a preliminary injunction. But an evidentiary hearing is unnecessary when either the material facts are undisputed or the adverse party has waived its right to a hearing. *Geertson Seed Farms. Johanns*, 570 F.3d 1130, 1139 (9th Cir. 2009). Here, both exceptions are satisfied. The parties affirmed that neither is requesting a hearing. (Doc. 12 at 2). More importantly, the majority of the facts relevant to the *Winter* analysis are either undisputed or the Court has assumed the Plaintiffs' facts are true. The Court has not considered the evidence submitted by the Defendants.[1]

The Court has also considered the Tribes' amici brief, which mostly cites historical facts and treaties. Neither the Plaintiffs nor the Defendants have disputed the Tribes' statements in their amici brief regarding the cultural significance of the bison hunt, nor the Tribes' reliance on bison meat for subsistence.

## IV. Discussion

### A. The Plaintiffs have failed to show harm is irreparable and likely

There are two components to the irreparable harm element. First, the harm must actually be irreparable, i.e., it cannot be adequately remedied by money

---

[1] Because the Court has not considered the Defendants' evidence, the Court denies as moot the Plaintiffs' motion to strike portions of the Defendants' evidence.

7

damages and is permanent or of long duration. *Amoco Prod. C. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987). Second, the irreparable harm must be likely, i.e., it cannot be speculative or merely possible. *Winter*, 555 U.S. at 22.

The timing of the motion is a factor to consider when evaluating irreparable harm. A long delay in seeking a preliminary injunction implies a lack of urgency and irreparable harm. *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). But a reasonable explanation for the delay might imply the opposite. *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014).

Here, the timing of the motion implies the harm is not irreparable. The 2019 bison hunt was publicly approved in December 2018 yet the Plaintiffs waited until late October 2019 to seek a preliminary injunction, after the bison hunting season had already begun for some Tribes and was mere weeks away for Montana hunters. Furthermore, the 2019 bison hunt is not a new or sudden development. The reason the Plaintiffs want to stop the 2019 hunt is because they expect the 2019 hunt will be similar to their experience with the hunt in prior years. They had the opportunity and motivation to seek a preliminary injunction well ahead of the 2019 hunting season but chose to wait until the season began anyway. The Court holds the delay weighs against finding any of the alleged harm is irreparable or likely.

The alleged harm from the loss of rental income is not irreparable because it can be remedied by money damages and the Plaintiffs have not provided evidence that the loss of rental income risks extinction of the rental business. Monetary injury is not considered irreparable except in certain circumstances. *HiQ Labs, Inc. v. LinkedIn Corporation*, 938 F.3d 985, 993 (9th Cir. 2019). The extinction of an ongoing business, which represents many years of effort and livelihood, is an irreparable harm because the loss cannot be fully compensated by money. *HiQ Labs, Inc.*, 938 F.3d at 993.

Here, the loss of rental income is not irreparable because money damages are an adequate remedy. The Plaintiffs have already filed an inverse condemnation lawsuit for just compensation from the loss of rental income. (Doc. 4-1 at 43 n. 9). The Plaintiffs concede money damages in the inverse condemnation case are an appropriate legal remedy for the loss of income. (Doc. 4-1 at 43 n. 9). To the extent the Plaintiffs contend the bison hunt threatens extinction of an ongoing business, they have not provided enough evidence to support that claim. The Court cannot conclude the rental business is likely to go extinct due to the bison hunt without business records, market trends, and other evidence that establishes the bison hunt threatens the extinction of the rental business.

The alleged harm from a stray bullet or the spread of Brucellosis may be irreparable but the Plaintiffs have not demonstrated either is likely. The Plaintiffs

claim they've seen hunters take wild shots but there is no evidence a bullet has ever come close to hitting a person or structure in the past. The Tribes and agencies have also established a 200 yard "clean zone" around homes in the area. Hunters may not shoot in the "clean zone." The Tribes also require participants attend an annual bison hunt orientation, conduct safety meetings, and coordinate with law enforcement. It is certainly possible a reckless hunter could accidentally shoot someone—that's true anywhere hunting is permitted—but on this record, the Court cannot conclude it is likely.

The transmission of Brucellosis is also not likely. The Plaintiffs have provided evidence bison can carry Brucellosis and that the bacteria causing Brucellosis can be transmitted from gut piles. (Doc. 4-45). However, the Plaintiffs' evidence stops short of claiming the transmission of Brucellosis is likely. At most, the Plaintiffs' evidence says the bison hunt near Beattie Gulch "increases the statistical chances" for the transmission of Brucellosis, but it does not state what the statistical odds are. For example, if the bison carry a 0.01% risk of Brucellosis transmission in Beattie Gulch without hunting but carry a a 0.02% risk of Brucellosis transmission with hunting, the statistical odds have increased but it nonetheless remains unlikely to be transmitted. The Court has been given no evidence quantifying what the statistical chances are of contracting Brucellosis

when bison are hunted in Beattie Gulch. The Court therefore cannot conclude on this record that the transmission of Brucellosis is likely.

Furthermore, to the extent the Plaintiffs argue the irreparable harm is the increase in the risk of contracting Brucellosis, the Court has been given no statistical evidence demonstrating how much the risk of contracting Brucellosis is increased when bison are hunted in Beattie Gulch. For example, if the bison carry a 0.01% risk of Brucellosis transmission in Beattie Gulch without hunting but carry a 10% risk of Brucellosis transmission with hunting, the statistical odds have increased a substantial degree. A substantial increase in the risk of contracting Brucellosis could potentially satisfy the irreparable harm element, but the Court has been given no statistical evidence demonstrating the increased risk is substantial. The Plaintiffs' evidence only demonstrates that the risk is "increased." The Court therefore cannot conclude on this record that a substantial increase in the risk of contracting Brucellosis is likely.

The final harm the Plaintiffs allege is no longer being able to see bison roam freely and suffering trauma from observing the bison hunt. To be clear, the Plaintiffs are not alleging irreparable harm to the bison population itself. Rather, they are alleging the bison hunt affects their own aesthetic interests and inflicts psychological trauma. The Court cannot conclude the alleged harm is irreparable because, taking the Plaintiffs' evidence as true, it does not establish their ability to

photograph or observe bison has been permanently harmed. It is undisputed thousands of bison roam freely year-round only minutes down the road in Yellowstone National Park where hunting is not allowed. As for the Plaintiffs' trauma, it is not irreparable because the Plaintiffs could choose not to watch the bison hunt, thereby preventing their trauma.

The Plaintiffs have failed to show their alleged harms are irreparable and likely.

### B. The balance of hardships and public interest weighs in favor of the Defendants

The balance of hardships factor requires courts to weigh the burden on each party if the injunction is granted or denied. *Winter*, 555 U.S. at 24. The public interest factor requires courts to consider the impact on the public at large. *Bernhardt v. Los Angeles County*, 339 F.3d 920, 932 (9th Cir. 2003). When the government is a party, the balance of hardships and the public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "In exercising their discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction. *Winter*, 555 U.S. at 24, (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Here, the balance of hardships and public interests weighs heavily in favor of the Defendants and the public, particularly the Tribes. The Plaintiffs argue the

threat to public safety and contracting Brucellosis weigh in favor of granting the injunction. But the Court has already determined, based on the Plaintiffs' evidence, that those risks are not likely. On the other hand, the hardship imposed on the Tribes is likely. The Tribes rely on bison hunting for subsistence, they use bison hides for clothing and other items, and the hunt itself serves as cultural preservation. Furthermore, the Tribes have had no time to plan for an abrupt halt to the bison hunt. They have been planning for months on the fair assumption that the 2019 bison hunt, which was approved in December 2018, would go forward. Balancing the loss of subsistence and cultural preservation against the unlikely risks to the Plaintiffs or public at large, the Court finds the balance of hardships and public interests tips heavily against the Plaintiffs.

## V. Conclusion and order

The Plaintiffs' motion for a preliminary injunction (Doc. 4) is denied. The Plaintiffs' motion to strike portions of the Defendants' evidence (Doc. 33) is denied as moot.

DATED this 2nd day of December, 2019.

_____
SUSAN P. WATTERS
United States District Judge