IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| NEIGHBORS AGAINST BISON SLAUGHTER, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> THE NATIONAL PARK SERVICE, *et al.*, <br><br> Defendants. | CV 19-128-BLG-SPW <br><br> ORDER RE DEFENDANTS' MOTION FOR VOLUNTARY REMAND OR STAY OF PROCEEDINGS |

Before the Court is the Defendants' motion for voluntary remand or stay of proceedings, filed June 30, 2020. (Doc. 84). Plaintiffs responded in opposition to the motion on September 17, 2020. (Doc. 103). Defendants filed their reply on October 1, 2020. (Doc. 105). Amici Tribes filed a brief in support of Defendants' motion (Doc. 101) and Defendants filed a notice of supplemental authority on January 7, 2021 (Doc. 106). For the following reasons, the motion is granted.

I. **BACKGROUND**

The facts of this case were extensively laid out in the Court's prior order denying Plaintiffs' motion for preliminary injunction. (Doc. 57). Only those facts relevant to this order shall be repeated.

1

The controversy stems from the Interagency Bison Management Plan's ("IBMP") annual Winter Operations Plan promulgation that coordinates a "hunt" of wild bison from the Yellowstone National Park herd in the Beattie Gulch area of the Custer-Gallatin National Forest. Federal, State, and Tribal entities—including the National Park Service, U.S. Forest Service, Montana Department of Livestock, and Montana Department of Fish, Wildlife and Parks—adopted the IBMP in 2000. The IBMP incorporates a nine-member committee made up of members from various cooperating agencies to analyze and coordinate relations among the groups. The IBMP describes the roles and responsibilities of the different agencies in order to foster cooperation in monitoring bison migration and coordinate hunting operations. In 2000, the IBMP analyzed the effects of hunting bison with anticipated kills of up to 85 a season split between areas in West Yellowstone and Beattie Gulch. (FS4392). The cooperating agencies decided to analyze future hunting operations as requests arose.[1] (FS4392). The IBMP does not narrow or enlarge the jurisdictional control of the agencies, however. When bison migrate, one of several agencies obtains jurisdiction over the animals depending on the herd's location:

> Within the boundaries of Yellowstone National Park, the Secretary of the Interior has exclusive jurisdiction to manage the park's natural resources, including the bison. Outside the park the State of Montana

---

[1] Annual bison kills have risen from 32 in the 2005-2006 season to 486 in 2017. (NPS8172; 8181).

has the management authority over the bison. When the bison are on national forest system lands, the U.S. Forest Service has responsibilities under federal laws to provide habitat for the bison, a native species. Federal law requires [the USDA Animal and Plant Health Inspection Service ("APHIS") to control and prevent the spread of communicable and contagious diseases of livestock.

(FS4207). The annual bison hunt serves as an important cultural event for the Tribes involved and has been a major source of sustenance for the Tribes' communities since the first hunt in 2005.

Plaintiffs filed suit in 2019 seeking to compel Defendants to complete a supplemental NEPA analysis and environmental impact statement ("EIS") on the impacts of the bison hunt in Beattie Gulch. Plaintiffs claim the hunt adversely impacts the natural environment and wildlife in Beattie Gulch and creates hazardous living conditions for residents.

## II. DISCUSSION

### A. Remand

Defendants seek a voluntary remand of this litigation without vacatur in order to prepare an additional NEPA analysis. The agencies intend to analyze new information and changed circumstances since the 2000 IBMP adoption. Defendants hope to evaluate alternative approaches to managing the wild bison under the IBMP by considering "different bison population ranges, options for managing bison inside the park, . . . [and] actions for dealing with brucellosis in

bison." (Doc. 84-1 at 18). Defendants also plan to analyze the indirect impacts of managing the bison herd, including hunting practices occurring outside Yellowstone Park. (*Id.*). Plaintiffs agree that a remand is needed to correct what they perceive as errors in Defendants' decision to adopt the IBMP. However, Plaintiffs argue at various points that Defendants' motion was made in bad faith as a tool to prolong litigation. Plaintiffs also assert that Defendants fail to adequately explain their reasoning for a voluntary remand.

It is common practice in the Ninth Circuit to grant a federal agency's voluntary request for a remand unless the request is frivolous or made in bad faith. *Cal. Cmtys. Against Toxics v. U.S. E.P.A. (CCAT)*, 688 F.3d 989, 992 (9th Cir. 2012). A federal agency may choose to request a remand to reconsider a prior decision in light of new, intervening events. *SKF USA Inc. v. United States*, 254 F.2d 1022, 1028 (Fed. Cir. 2001). A federal agency may even request a remand, in the absence of intervening events, because the agency "had doubts about the correctness of its decision or that decision's relationship to the agency's other policies." *Id.* at 1029. This request does not require the agency to confess that the prior decision was made in error. *Id.* "[I]f the agency's concern is substantial and legitimate, a remand is usually appropriate." *Id.*

The Court does not find that Defendants' request for a remand is made frivolously or in bad faith. Further, the reasons given for the remand represent

substantial and legitimate concerns for Defendants to revisit prior decisions regarding the IBMP and how those decisions have been implemented since 2000. The Court grants Defendants' request for a voluntary remand in order to conduct additional NEPA analysis regarding the IBMP.

## B. Remand without Vacatur

Defendants argue remand should be without vacatur because equitable factors weigh against such a finding. First, Defendants assert that vacatur is not necessary as "there is at least a serious possibility that the agencies can cure any procedural errors related to the IBMP and adopt a bison management scheme that is substantially similar to the status quo." (Doc. 84-1 at 23). Although Defendants intend to re-examine the decisions to adopt IBMP in light of information gained from the past twenty years, the agencies maintain that there are no fundamental flaws with the prior decisions that would prevent a similar decision now, should the new analysis warrant it. Second, Plaintiffs cannot demonstrate irreparable harm relating to the IBMP decision and public interest weighs against vacatur. Defendants point to this Court's prior decision to deny Plaintiffs' motion for a preliminary injunction in part because Plaintiffs could not demonstrate irreparable harm warranting that relief. *See Neighbors Against Bison Slaughter v. Nat'l Park Serv.*, 2019 WL 6465093, *3-5 (D. Mont. Dec. 12, 2019). Vacatur would also create significant confusion among the cooperating agencies over how to control

5

and monitor the bison herds. Further, Defendants assert vacatur would not prevent State or Tribal hunting as those activities are outside Defendants' control.

Plaintiffs disagree that the remand should be without vacatur. Vacatur is an appropriate and common remedy, according to their argument, when a federal agency's prior decision was in violation of statutory authority. Plaintiffs assert the recent implementation of IBMP is illegal to the extent it allows bison kills in excess of the analyzed 85 kills a year and to the extent the implementation allows hunters to leave gut-piles from their kills behind. These hunts further present dangers to the human population living in the area of Beattie Gulch and were not properly analyzed by the original IBMP NEPA review. Because of these flaws with the current bison hunt operation, Plaintiffs assert Defendants would be prevented from readopting IBMP in its current form because "the Park Service knows its bison management plan is not serving the public." (Doc. 103 at 35). Plaintiffs seek to vacate IBMP's implementation to the extent it allows these activities to continue. Plaintiffs make several arguments for why public interest supports a vacatur including risks to human health and adverse impacts to local businesses. Plaintiffs also assert that a vacatur would not restrict Amici Tribes' access to bison meat and materials. Finally, by requesting a remand without explanation, Plaintiffs assert Defendants confessed error in their prior decision and such error requires the Court to impose a vacatur.

"Vacatur is the presumptive remedy when a court finds an agency's decision is unlawful under the Administrative Procedure Act ('APA')." *AquAlliance v. U.S. Bureau of Reclamation*, 312 F.Supp.3d 878, 880 (E.D. Cal. 2018) (citing 5 U.S.C. § 706(2)(A)). Despite this, vacatur is not appropriate in every case. "When equity demands, [the decision] can be left in place while the agency follows the necessary procedures to correct its action." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

It is rare to decline vacatur but permissible if the decision meets the two-factor test laid out in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). "The *Allied-Signal* factors are: (1) the seriousness of an agency's errors and (2) the disruptive consequences that would result from vacatur." *AquAlliance*, 312 F.Supp.3d at 881. If vacatur would cause "serious and irremediable harms that significantly outweigh the magnitude of the agency's error," vacatur is likely inappropriate. *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F.Supp.3d 1238, 1242 (N.D. Cal. 2015) (quoting *League of Wilderness Defenders/Blue Mts. Biodiversity Project v. U.S. Forest Serv.*, 2012 WL 13042847, *6 (D. Or. 2012)) (internal quotes omitted).

Here, the Court finds that remand without vacatur is appropriate given the serious and irremediable harms that vacatur would produce. The Court does not

find that Defendants confessed error in their prior decision by requesting a remand. A federal agency is not required to confess error in order to seek voluntary remand, *SKF USA Inc.*, 254 F.2d at 1029, and the Court finds that Defendants adequately explained their desire for remand in order to reconsider impacts of the IMBP since its implementation in 2000 and to consider bison management alternatives.

Plaintiffs assertions of serious harm from the continued bison hunt during remand go to the seriousness of Defendants' alleged errors but are offset by the Court's prior findings in its denial of Plaintiffs' preliminary injunction. *See Slaughter*, 2019 WL 6465093, at *4-5. While the Court remains sympathetic to Plaintiffs' concerns, the harms alleged remained too attenuated for the equitable relief sought. Plaintiffs have not provided any evidence that a hunter's stray bullet has come close to a resident's home nor have they provided evidence to refute Amici Tribes' assertion that the recently adopted safety procedures have reduced safety concerns since 2017. Plaintiffs have likewise failed to provide evidence that the gut-piles left behind have actually attracted grizzly bears during the hunting season or led to infections of brucellosis. Finally, having failed in their attempt to claim money damages under a Fifth Amendment takings claim, Plaintiffs now claim that lost monetary value in a resident's local business weighs in favor of vacatur. While the Court is sympathetic to the loss of business allegedly resulting

from the hunt, the Court does not find that this injury outweighs the harms vacatur would cause through agency disruption and loss of tribal hunting access.

In comparison, Defendants assert numerous serious harms that would stem from vacatur, including disruption of collaborative bison management goals, jeopardizing Amici Tribes exercise of sovereign hunting rights, and would result in "confusion about the management framework for bison on National Forest Systems lands". (Doc. 84-1 at 28). Defendants contend that vacatur would actually produce greater harm to bison and the residents of Beattie Gulch because agencies would lose the ability to effectively monitor and predict hunting activities. Confusion could then lead to an increase number of bison migrating out of Yellowstone Park and negatively impacting local livestock and landowners.

An identical issue recently appeared before Judge Haddon in *Cottonwood Envt'l Law Cent'r v. Bernhardt*, Case No. CV 19-12-BU-SEH. (See Doc. 106-1). In *Envt'l Law Cent'r*, the federal defendants filed a motion for voluntary remand to conduct an additional NEPA analysis of the IBMP after the plaintiffs filed a lawsuit seeking to enjoin the IBMP. The federal defendants requested the remand be without vacatur. (Doc. 106-1 at 5). Environmental Law Center agreed that remand was necessary but argued that the case should proceed to address the merits of a preliminary injunction. (*Id.*) Judge Haddon, citing *Cal. Cmtys. Against Toxics*, agreed with the federal defendants that a remand without vacatur was

9

necessary because "[v]acation of the IBMP while an additional NEPA analysis is undertaken would be extremely disruptive to vital bison management practices, and would leave the affected parties without any operative bison management plan in place." (Doc. 106-1 at 6).

Judge Haddon's rationale applies equally here. Federal Defendants' argument is persuasive that vacatur of the IBMP, even to a limited extent, would create significant confusion among the cooperating agencies, making the annual bison hunt unpredictable. It would also restrain on going efforts by the IBMP committee to address many of the concerns raised by Plaintiffs. Finally, as described by Federal Defendants, "[a]ctions necessary to meet the IBMP's objectives would be halted, including efforts to: (1) monitor bison to determine current and desired population size and distribution; (2) define tolerance zones to limit the spread of brucellosis; (3) identify and reduce risks posed by bison to the public; (4) protect livestock; and (5) coordinate in the management of natural and cultural resource values important to IBMP members not named in this suit." (Doc. 84-1 at 28). The Court finds that vacatur would cause serious irremediable harms that significantly outweigh any agency error. Vacatur of IBMP's bison management plan is therefore inappropriate.

Lastly, Plaintiffs argue that, if a remand is ordered, the Court should impose a time-limit of two years within which Federal Defendants must complete their

10

NEPA analysis. Plaintiffs claim such a time restriction is necessary due to Federal Defendant's perceived history of delay and to prevent further unnecessary delay under 5 U.S.C. § 706(1).

Federal Defendants counter that absent substantial justification, a court should not dictate time restraints on an agency's work as Congress has determined the methods and time dimensions necessary for an agency to fulfill its obligation. *See Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326 (1976). Federal Defendants assert no substantial justification necessitates a time restriction in this case and "Department of the Interior Secretarial Order 3355 already imposes a timeline on NEPA completion," alleviating the need for a court order. (Doc. 105 at 15).

Although it is true that this case has endured an extended timeline, Plaintiffs have not presented any evidence that the delay was unreasonable or that any documents or evidence were unlawfully withheld. Therefore, the Court has no authority to impose the requested timeline on Federal Defendants' NEPA analysis and shall defer to Interior Secretarial Order 3355's timeline.[2]

---

[2] Available at https://www.doi.gov/sites/doi.gov/files/elips/documents/3355_-_streamlining_national_environmental_policy_reviews_and_implementation_of_executive_order_13807_establishing_discipline_and_accountability_in_the_environmental_review_and_permitting_process_for.pdf.

11

//

## III. CONCLUSION

IT IS HEREBY ORDERED that Federal Defendants' Motion to Remand Without Vacatur[3] (Doc. 84) is GRANTED.

DATED this 4th day of February, 2021.

*Susan P. Watters*
SUSAN P. WATTERS
United States District Judge

---

[3] Federal Defendants make an alternative argument that the proceedings should be stayed until completion of the NEPA analysis. Having found remand without vacatur appropriate, this alternative motion is denied as moot. The Court similarly denies Plaintiffs' request for an evidentiary hearing as moot.